MELINDA MERRILL, an Infant, by FRANCES MERRILL, Her Mother and Natural Guardian, et al., Respondents, v ALBANY MEDICAL CENTER HOSPITAL et al., Defendants, and MARTIN E. MCKNEALLY, Appellant.

Third Department, February 26, 1987

APPEARANCES OF COUNSEL

*Carter, Conboy, Bardwell, Case & Blackmore (Forrest N. Case of counsel; Dianne Bresee Mayberger on the brief), for appellant.*

*Kohn, Bookstein & Karp (Raymond S. Zierak of counsel), for respondents.*

**OPINION OF THE COURT**

MAIN, J.

On August 4, 1977, it was determined that the infant plaintiff (hereinafter plaintiff), then 22 months of age, required major surgery for the removal of a suspected malignant tumor from her right lung. After surgery had proceeded for approximately one hour, plaintiff suffered cardiac arrest. She was resuscitated by defendant Dr. Martin E. McKneally (hereinafter defendant), who enlarged the incision in her chest so as to enable him to manually massage plaintiff's heart. This procedure restored the heart's function and despite the incident, the operation proceeded. It was completed about two hours later. However, at its conclusion, plaintiff lapsed into a coma. This condition lasted for two months and was determined to have been caused by a lack of oxygen for at least 5 to 10 minutes during the operation. The consequences were catastrophic, causing plaintiff to suffer severe and diffuse brain damage with marked difficulty with both intellectual and motor functions.

In 1979, plaintiff and her mother commenced this action against the following: Albany Medical Center Hospital; Drs. Medha Praham and Rob Roy, resident anesthesiologists attending plaintiff during the surgery; Dr. Alexander McDonald, the hospital's teaching anesthesiologist; and defendant. At the conclusion of the trial, but prior to summations and submission of the case to the jury, plaintiff's case against the hospital and the other doctors was settled for the total sum of $2,000,000. The case went to the jury solely as to defendant. The verdict apportioned liability as follows: against the hospital 30%; Dr. Praham 30%; Dr. Roy 30%; Dr. McDonald 7%; and defendant 3%. The total award to plaintiff was $12,393,130 and to her mother $261,556.09. The trial court thereafter reduced the verdicts to $10,393,130 and $177,000, respectively, assessing 3% of each amount to defendant (see, General Obligations Law § 15-108). This appeal by defendant ensued.

The sole issue presented on this appeal is whether the verdict is excessive. Plaintiff's damages were separately stated in response to the trial court's interrogatories as follows: pain and suffering $1,500,000; loss of future earnings $1,302,928; future medical expenses $2,000,000; custodial care including allowance for nursing care $5,603,309; and rehabilitation services $1,986,893. The mother's recovery was broken down as follows: medical expenses to date $24,297.90; custodial care to

date $37,258.19; and nursing services rendered to date $200,000. It is well settled that a jury's assessment of damages should not be disturbed unless it is so excessive or inadequate that it shocks the conscience of the court *(Welty v Brown,* 57 AD2d 1000, *appeal dismissed* 42 NY2d 995; *Good v Mantaibano,* 50 AD2d 885). Such a principle, of course, requires careful review of the medical testimony, which in this case was uncontested by any conflicting expert medical testimony. Dr. Martin W. Kremenitzer, a pediatric neurologist and professor of pediatric neurology at Yale University, testified of finding that in plaintiff "we have evidence for a girl with diffuse brain damage with marked difficulty with both intellectual and motor functions; she is spastic * * * she has cerebral palsy; she can't think; she can't talk; she can't ambulate on her own; she will need extensive help from opthalmology, neurology, rehabilitation, physical therapy and special education * * * indefinitely for life". As to his prognosis of her development even with optimum care, he concluded that "I seriously doubt whether she will walk independently, whether she will be able to, in any way, become employed, whether she will be able to maintain a house, a room, to cook for herself. I don't think I can think of a single area of functioning where she will be independent." According to Dr. Jeffrey Schumacher, her attending pediatrician since 11 months after the surgery, plaintiff cannot learn to walk with a walker and she cannot manage a wheelchair. She is suffering spasticity and contractures of leg muscles which produce pain. Continuous therapy is needed to maintain the status quo. If she fails to receive the therapy, she will have many medical complications, ranging from minor things such as heel cord tightening to scoliosis or hip dislocation; Dr. Schumacher testified that plaintiff experiences continuous pain from this condition. In addition, plaintiff is legally blind and cannot watch television or read. According to Dr. Kremenitzer, plaintiff will develop arthritic disease of her spine. Her disabilities and limitations seem unending and, most significantly, her capacity to feel pain and experience suffering is undiminished. She has a life expectancy of 77 years.

As the Court of Appeals has noted: "It goes without saying that [the] court, lacking clairvoyance, in evaluating a verdict intended *to compensate for a projected long lifetime of pain,* suffering, helplessness and all the other tangible and intangible losses that were sure to follow, face[s] an unusually difficult judgmental responsibility, for the fulfillment of which

no less than a sophisticated elasticity will ever do. In no two cases are the quality and quantity of such damages identical. As has been pointed out by pragmatists and theorists who have wrestled with the problem of how damages in such cases may justly be arrived at, evaluation does not lend itself to neat mathematical calculation" *(Caprara v Chrysler Corp.,* 52 NY2d 114, 126-127).

This jury was in an understandably difficult position and either was overcome with sympathy, and this case would engender sympathy in abundance even from the most calloused sort, or perhaps was aroused by the unsettling incident which occurred just prior to the commencement of the surgery about which no more need now be said, or perhaps felt bound by the testimony of plaintiff's expert on damages, since it was hardly challenged. For whatever reason, its verdict was excessive and must be reduced. Therefore, the judgment should be modified and a new trial ordered as to the issue of damages only, unless, within 20 days after the service of a copy of the order to be entered herein, plaintiff shall stipulate to reduce the amount of the verdict in her favor to $6,143,130, in which event, the judgment, as so reduced, should be affirmed.

KANE, J. P. (concurring in part and dissenting in part). We agree that the verdict, as reduced by the trial court, is excessive. However, we do not agree that the mere reduction of the award will produce an acceptable result. First, the unusual posture of this case at the time of its submission to the jury made it ripe for an excessive award. After some six weeks of trial, during which time the jury was exposed to an array of expert witnesses who described in detail the devastating and tragic consequences of the treatment received by the infant plaintiff (hereinafter plaintiff) and the projected enormous future costs, the jury was abruptly left with a lone defendant of questionable liability.

Throughout plaintiffs' case, counsel for defendant Dr. Martin E. McKneally (hereinafter defendant), as a matter of strategy, had elected to limit his participation in the trial, and instead to rely upon extensive cross-examination of plaintiffs' expert witnesses by counsel for those defendants who ultimately settled with plaintiffs, thus removing defendant from the glare of liability. The record demonstrates the efficacy of this decision, as well as a sound basis for the well-founded conviction by defendant of his lack of responsibility for the injuries and damages sustained by plaintiffs. Yet the jury,

uninformed of the amounts received by plaintiffs from the settling parties, and undoubtedly bewildered by the turn of events, was left suddenly in a vacuum where its emotions could be charged only with the deepest sympathy. Under such circumstances, it was inevitable that the jury's deliberations would produce a distorted result. Such a verdict should not stand, for the mischief caused thereby improperly influences the measurement of the average severity of jury awards (see, Danzon, New Evidence on the Frequency and Severity of Medical Malpractice Claims [Rand Corporation, R-3410-ICJ, 1986]).

In addition, we find the expert testimony projecting future costs and loss of earnings far too speculative and without adequate safeguards to insure a sufficient foundation for its admission into evidence. It is axiomatic that loss of earnings must be shown with reasonable certainty and not be speculative in character (36 NY Jur 2d, Damages, § 68, at 118). The measure of damages must be based, in part, upon the earning capacity of the injured person before and after the accident (25A CJS, Damages, § 162 [8], at 105). Here, there was no proper foundation to support the expert's testimony which established prospective earnings for a 22-month-old infant at $1,302,928. Projections of an individual's earnings for such a prolonged period are inherently speculative and, when based solely upon mathematical computations and subjective reasoning, are prejudicial, lack the requisite probative value, and are accordingly inadmissible (see, Franchell v Sims, 73 AD2d 1).

The same reasoning must apply to the projected amounts for future care and custodial costs. During the 77-year life expectancy of an infant such as plaintiff, many social and economic changes are inevitable and, again, mere mathematical and theoretical computations do not suffice to paint the true picture, particularly in view of the actual costs incurred up to the time of trial. We cannot overlook the fact that these mathematical computations of projected costs, made by an expert witness, were founded upon the subjective determination of the witness as to events to take place in the distant future. We recognize that his testimony was uncontroverted. However, as previously indicated, the parties that were expected to produce contrary evidence chose instead to settle at the conclusion of the trial, leaving this marginally liable defendant to answer to a jury which had no choice but to accept the uncontradicted, yet excessive measures of damages placed before them.

Finally, concern for the size of jury awards in malpractice litigation and the lump-sum payment of such awards has been the focus of considerable legislative activity. For example, although not applicable to this appeal, we note that the standard for appellate review of monetary awards has been changed from "shocking the conscience of the court" to that which "deviates materially from what would be reasonable compensation" (CPLR 5501 [c], as amended by L 1986, ch 682, § 10, eff July 30, 1986). Additionally, had this action been commenced on or after July 1, 1985, the verdict returned would have been "structured" in accord with specific statutory requirements, which include an immediate payment of a portion of the damages and, among other things, an annuity contract for the payments of future damages in periodic installments (CPLR 5031). In the case of an infant, the court could arguably direct that even an agreed settlement be so "structured" (Siegel, Practice Commentary, McKinney's Cons Laws of NY, Book 7B, art 50-A, at 638 [1987 Supp Pamph]). In our view, the circumstances of this type of case require such a direction in the absence of present statutory authority, for if such a procedure were followed, the ultimate benefits paid to plaintiff throughout her lifetime could, with proper guidance and planning, be far in excess of the $2,000,000 actually paid in settlement.

All of these considerations suggest further scrutiny of the naked application of economic theory to legal principle when projecting future events. As is demonstrated by the result in this case, internal flaws in the testimony presented by "expert economists" magnify and distort the actual present monetary liability of those defendants ultimately held responsible. Accordingly, and for the reasons stated, we would reverse the judgment so entered and order a new trial on the issue of damages.

MIKOLL and YESAWICH, JR., JJ., concur with MAIN, J.; KANE, J. P., and HARVEY, J., concur in part and dissent in part in an opinion by KANE, J. P.

Judgment modified, on the law and the facts, with costs to plaintiffs, and a new trial ordered as to the issue of damages only, unless, within 20 days after service of a copy of the order to be entered upon this decision with notice of entry, plaintiff Melinda Merrill shall stipulate to reduce the amount of the verdict in her favor to $6,143,130, in which event, the judgment, as so reduced, is affirmed.