■ MARY ANN IMBIEROWICZ, Individually and as Administrator of the Estate of SIGMUND IMBIEROWICZ, Deceased, Respon-

dent, v A.O. Fox Memorial Hospital et al., Appellants. [841 NYS2d 168]—

Rose, J. Appeal from a judgment of the Supreme Court (Spargo, J.), entered February 8, 2006 in Albany County, upon a verdict rendered in favor of plaintiff.

After six days spent in two hospitals, decedent died of cardiac arrest. The autopsy revealed that his ascending aorta had dissected and leaked blood into his pericardium, ultimately compressing his heart until it stopped. Plaintiff, decedent's wife, commenced this medical malpractice action seeking to recover damages for defendants' failure to diagnose his fatal condition. After a four-week trial, the jury exonerated five defendants, but found four others negligent. It apportioned 20% of the fault to defendant A.O. Fox Memorial Hospital (hereinafter Fox), where decedent was initially treated, 15% to defendant Benjamin Friedell, a family practice physician employed by Fox, 45% to defendant Capital Cardiology Associates (hereinafter CCA), and 20% to defendant John Gould, a CCA cardiologist who became involved after decedent's transfer to defendant Albany Medical

Center (hereinafter AMC). In addition to awarding $100,000 to each of decedent's two children, the jury awarded plaintiff a total of $1,050,000 in past and future pecuniary damages. Supreme Court later denied defendants' motions to set aside the verdict.

Among their contentions on appeal, defendants argue that the jury's findings of malpractice are not supported by legally sufficient evidence. Only with respect to the separate liability of Fox, however, can we say " 'that there is simply no valid line of reasoning and permissible inferences which could possibly lead rational [people] to the conclusion reached by the jury on the basis of the evidence presented at trial' " (*Cramer v Benedictine Hosp.*, 301 AD2d 924, 928-929 [2003], quoting *Cohen v Hallmark Cards*, 45 NY2d 493, 499 [1978]).

Plaintiff's expert cardiologist testified that while aortic dissection is uncommon, it is imminently life-threatening and should be promptly ruled out through further testing where, as here, the patient presents with all of the symptoms typical of that condition. He opined that, given the information available to Friedell and Gould, their failure to consider this diagnosis was a deviation from the standard of care. Despite defendants' argument to the contrary, plaintiff's expert established a uniform minimum threshold of care, and it was not necessary for plaintiff to prove the standard of care in the specific locality (*see Hoagland v Kamp*, 155 AD2d 148, 150 [1990]). In light of this evidence, we conclude that a valid line of reasoning exists to support the jury's conclusion that Friedell and Gould deviated from the standard of care by failing to order an appropriate test to rule out aortic dissection. In addition, the separate liability of CCA is supported by evidence that it failed to have one of its cardiologists review the preliminary results of a transthoracic echocardiogram (hereinafter TTE) that was performed and noted in decedent's chart on June 9, 1999, and failed to provide continuity of care by not assuring that Gould was informed on June 9 that the TTE had revealed a pericardial effusion.

We also find the evidence sufficient to support the jury's finding that the negligence of Friedell and Gould was a proximate cause of decedent's death. Plaintiff's experts testified that a CT scan or a transesophageal echocardiogram successfully detects aortic dissection in 98% of cases and prompt surgical repair would have provided an 80% chance of survival. Gould nonetheless contends that plaintiff did not show that decedent would have had "an appreciable chance of avoiding the loss suffered" in the approximately six hours between when he examined

decedent on the morning of June 10, 1999 and when decedent suffered cardiac arrest (*Brown v State of New York*, 192 AD2d 936, 938 [1993], *lv denied* 82 NY2d 654 [1993]). Although plaintiff's experts did not testify as to the time required to perform a CT scan at AMC, one of Gould's experts testified that it could be done in less than four hours at most tertiary care facilities. No one, including Gould, testified that more time would have been required at AMC. In addition, plaintiff's expert thoracic surgeon testified that once surgery is found to be necessary, it takes 30 to 60 minutes to set up an operating room at his institution. This evidence, when viewed in a light most favorable to plaintiff (*see e.g. King v Jordan*, 265 AD2d 619, 620 [1999]; *Karney v Arnot-Ogden Mem. Hosp.*, 251 AD2d 780, 782 [1998], *lv dismissed* 92 NY2d 942 [1998]), is sufficient to permit a reasonable person to conclude that it was more probable than not that if Gould had ordered an appropriate test to be done right away, it could have been conducted, an accurate diagnosis made and corrective surgery begun before decedent suffered cardiac arrest (*see Turcsik v Guthrie Clinic, Ltd.*, 12 AD3d 883, 887 [2004]; *Slaybough v Littauer Hosp.*, 202 AD2d 773, 775-776 [1994], *lv dismissed and denied* 83 NY2d 962 [1994]; *O'Connell v Albany Med. Ctr. Hosp.*, 101 AD2d 637, 638 [1984]).

Further, we are not persuaded that the jury's findings of negligence as to these defendants were against the weight of the evidence. Contrary to CCA's argument, plaintiff's failure to prove exactly when the TTE results became available on June 9, 1999 did not unduly preponderate against the jury's finding of a lack of continuity of care sometime that day. A note written in decedent's chart by AMC's TTE technician indicated that the results, which advised of a pericardial effusion, became available sometime after 3:45 P.M. and before later chart entries for June 9. Since none of CCA's cardiologists covering AMC was aware of the results on June 9 and the gap in treatment was not adequately explained, an inference of a lack of continuity of care reasonably could be drawn. We also cannot agree with Gould's and Friedell's claim that the mere fact that none of the many physicians who saw decedent considered aortic dissection establishes a lesser standard of care than that testified to by plaintiff's expert. Absent compelling proof of a different standard, this fact is equally capable of establishing that all were negligent in treating decedent. Accordingly, we cannot say that the jury's verdict as to these defendants is based upon an unfair interpretation of the evidence (*see e.g. Lolik v Big V Supermarkets*, 86 NY2d 744, 746 [1995]; *Postlethwaite v United Health Servs. Hosps.*, 5 AD3d 892, 894 [2004]).

As for Fox, however, we agree that the evidence does not sup-

port the jury's imposition of 20% liability separate from Friedell. The jury properly found Fox vicariously liable by virtue of Friedell's negligence (*see e.g. Monostori v Murphy*, 34 AD3d 882, 883 [2006]). A hospital also can be held directly liable for breach of the duties which it, as an institution, owes to its patients (*see e.g. Malaspina v Victory Mem. Hosp.*, 29 AD3d 646, 647 [2006]; *see also* 1B NY PJI 2:151, at 852 [2007]). Here, no hospital staff other than Friedell was shown to have been negligent, and Fox's only apparent role in diagnosing decedent's condition was to provide a treating physician. Thus, only vicarious liability of Fox was proven.

We also find merit in defendants' challenge to Supreme Court's jury charge based upon *Noseworthy v City of New York* (298 NY 76 [1948]). While the court tried to circumscribe the scope of the reduced burden of proof to be applied under *Noseworthy*, its further instructions drawn from the Pattern Jury Instructions (*see* 1A NY PJI 1:61, at 69-70 [2007]) improperly permitted the jury greater latitude in inferring negligence from all the evidence. Where, as here, a decedent's testimony of relevant facts would be limited to his or her communications with the treating physicians, the trial court should not give an "all or nothing" charge as set forth in Pattern Jury Instruction 1:61 (*see Stewart v Olean Med. Group, P.C.*, 17 AD3d 1094, 1096 [2005]; *see also Holiday v Huntington Hosp.*, 164 AD2d 424, 428 [1990]). Here, in response to counsel's request, Supreme Court told the jury that the *Noseworthy* rule "applies to such testimony as [decedent] could have testified to if he were alive." However, the court then stated: "Thus, you are permitted greater latitude in inferring negligence on the part of the defendants from all of the evidence in the case." This instruction effectively retracted the prior limitation and likely led the jury to conclude that plaintiff had a lesser burden of proof as to negligence, including whether there was a deviation from the standard of care and other issues about which decedent could have offered no relevant testimony (*see Bin Xin Tan v St. Vincent's Hosp. & Med. Ctr. of N.Y.*, 294 AD2d 122, 123 [2002]). Accordingly, the judgment must be reversed and the matter remitted for a new trial as to the liability of Friedell, Gould and CCA.

Turning to the jury's awards for past and future pecuniary loss, we find that plaintiff's proof of decedent's potential income was improperly presented to, and considered by, the jury. A decedent's gross income at the time of death is the proper measure of the value of past and future lost earnings (*see Johnson v Manhattan & Bronx Surface Tr. Operating Auth.*, 71 NY2d 198,

204 [1988]; *Plotkin v New York City Health & Hosps. Corp.*, 221 AD2d 425, 426 [1995], *lv dismissed* 88 NY2d 917 [1996]). While increased future earnings could be considered if they were likely to occur (*see e.g. Kirschhoffer v Van Dyke*, 173 AD2d 7, 10 [1991]), damages for wrongful death are not recoverable when they are based on contingencies that are "uncertain, dependent on future changeable events and, thus, inherently speculative" (*Farrar v Brooklyn Union Gas Co.*, 73 NY2d 802, 804 [1988]). Here, plaintiff primarily relied upon the testimony of an economist who had based his calculation of what decedent would have earned as a construction worker upon average income data for construction workers in the Cities of Albany, Schenectady and Troy. The economist conceded that this data did not include earnings of construction workers in Delaware County, the much more rural area where decedent had lived and worked, and there was no evidence that decedent would have or could have worked in Albany, Schenectady or Troy. Thus, the economist's opinion of the value of the earnings lost was speculative and lacked a proper foundation (*see Toscarelli v Purdy*, 217 AD2d 815, 818 [1995]; *Merrill v Albany Med. Ctr. Hosp.*, 126 AD2d 66, 70 [1987] [Kane, J.P., concurring in part and dissenting in part], *appeal dismissed* 71 NY2d 990 [1988]; *Morales v City of New York*, 115 AD2d 439, 439-440 [1985], *lv denied* 67 NY2d 605 [1986]). While the record contains other evidence of what decedent had earned and would likely earn in Delaware County, it leads to a lower annual income amount than that stated by the economist. Since the jury's awards do not state lost earnings separate from other pecuniary loss, we cannot determine whether they were based on speculation. Accordingly, the matter must be remitted for a new trial on damages as well (*see Murry v Witherel*, 287 AD2d 926, 929 [2001]; *Edwards v Stamford Healthcare Socy.*, 267 AD2d 825, 828 [1999]).

Defendants' remaining contentions, including their challenges to plaintiff's summation, Supreme Court's charge concerning proximate cause and the court's handling of certain disputes among counsel, have been considered and found to be unavailing.

Crew III, J.P., Mugglin and Kane, JJ., concur. Ordered that the judgment is reversed, on the law, motion by defendant A.O. Fox Memorial Hospital to set aside the verdict with respect to its separate liability granted, and matter remitted to the Supreme Court for a new trial as to defendants Benjamin Friedell, Capital Cardiology Associates and John Gould, with costs to abide the event.