# SUPREME COURT OF THE STATE OF NEW YORK
## *Appellate Division, Fourth Judicial Department*

**914**

**CA 12-00577**

PRESENT: SMITH, J.P., PERADOTTO, CARNI, LINDLEY, AND MARTOCHE, JJ.

---

JOANNE WILK, AS ADMINISTRATRIX OF THE ESTATE
OF STEVEN R. WILK, DECEASED,
PLAINTIFF-RESPONDENT,

V                                          MEMORANDUM AND ORDER

DAVID M. JAMES, M.D., KALEIDA HEALTH, DOING
BUSINESS AS MILLARD FILLMORE HEALTH
SYSTEM-THREE GATES CIRCLE HOSPITAL, SADIR
ALRAWI, M.D., MERCY AMBULATORY CARE CENTER,
CATHOLIC HEALTH SYSTEM, INC., BUFFALO
EMERGENCY ASSOCIATES, LLP, DEFENDANTS-APPELLANTS,
ET AL., DEFENDANTS.

---

ROACH, BROWN, MCCARTHY & GRUBER, P.C., BUFFALO (JOHN P. DANIEU OF
COUNSEL), FOR DEFENDANT-APPELLANT KALEIDA HEALTH, DOING BUSINESS AS
MILLARD FILLMORE HEALTH SYSTEM-THREE GATES CIRCLE HOSPITAL.

GIBSON, MCASKILL & CROSBY, LLP, BUFFALO (RYAN P. CRAWFORD OF COUNSEL),
FOR DEFENDANTS-APPELLANTS SADIR ALRAWI, M.D. AND BUFFALO EMERGENCY
ASSOCIATES, LLP.

RICOTTA & VISCO, ATTORNEYS & COUNSELORS AT LAW, BUFFALO (K. JOHN BLAND
OF COUNSEL), FOR DEFENDANT-APPELLANT DAVID M. JAMES, M.D.

DAMON MOREY LLP, BUFFALO (JAMES E. BALCARCZYK, II, OF COUNSEL), FOR
DEFENDANTS-APPELLANTS MERCY AMBULATORY CARE CENTER AND CATHOLIC HEALTH
SYSTEM, INC.

HAMSHER & VALENTINE, BUFFALO (RICHARD P. VALENTINE OF COUNSEL), FOR
PLAINTIFF-RESPONDENT.

---

Appeals from an order of the Supreme Court, Erie County (Patrick
H. NeMoyer, J.), entered July 14, 2011 in a medical malpractice
action. The order denied the motions of defendants David M. James,
M.D., Kaleida Health, doing business as Millard Fillmore Health
System-Three Gates Circle Hospital, Sadir Alrawi, M.D., Mercy
Ambulatory Care Center, Catholic Health System, Inc., and Buffalo
Emergency Associates, LLP for summary judgment dismissing the amended
complaint and all cross claims against them.

It is hereby ORDERED that the order so appealed from is affirmed
without costs.

Memorandum:  Plaintiff commenced this medical malpractice and wrongful death action seeking damages for the conscious pain and suffering, and death of Steven R. Wilk (decedent) as a result of the alleged failure by defendants to diagnose and treat decedent's aortic dissection in a timely manner.  The death certificate revealed that the immediate cause of death was a "cerebral infarct with herniation[,] . . . due to or as a consequence of . . . shock with intestinal ischemia[,] . . . due to or as a consequence of . . . aortic dissection."  Defendants-appellants (defendants) moved for summary judgment dismissing the amended complaint and all cross claims against them and, although Supreme Court concluded that defendants met their initial burden on their respective motions, the court determined that plaintiff's submissions raised issues of fact.  Thus, the court denied the motions.  We affirm.

On February 13, 2004, decedent was transported by ambulance to the emergency room operated by defendant Kaleida Health, doing business as Millard Fillmore Health System-Three Gates Circle Hospital (Kaleida), and was treated by defendant David M. James, M.D. and Kaleida's staff.  The ambulance record indicated that decedent's "chief complaint" was "severe back pain" that, according to the "subjective assessment" entry on that record, started at 9:30 a.m. and felt like someone "hit [him with a] baseball bat."  However, the "comments" section of the ambulance record contains an entry stating that the pain started "2 days ago."  The triage nurse at Kaleida, a hospital employee, documented a "2 day [history] of lower back pain," but did not document decedent's complaint that the severe back pain started within 90 minutes of his arrival at the emergency room.  Thus, decedent's report of the sudden onset of severe back pain was not carried forward from the ambulance record to the triage note in his medical chart at Kaleida.  It is undisputed that the sudden onset of severe back pain is a telltale symptom of aortic dissection.

The nurse practitioner who initially assessed decedent upon his arrival at the emergency room testified at her deposition that she reviewed the triage note to obtain information about the history of decedent's onset of pain and that it did not indicate that the pain had started suddenly at 9:30 a.m. that morning.  The nurse practitioner did not recall whether she reviewed the ambulance record when she saw decedent in the emergency room.  The nurse practitioner also testified that decedent's symptoms supported a differential diagnosis of aortic dissection.  She agreed that the appropriate diagnostic test to rule out an aortic dissection was a CT scan with contrast.  Nonetheless, a CT scan was neither ordered nor performed, and decedent was discharged with a diagnosis of "thoracic spine strain."  The nurse practitioner explained at her deposition that she abandoned the differential diagnosis of aortic dissection because, in her experience, patients who "have had a dissecting aneurism, do not have pain for two days prior to ending up in the emergency room." Notably, defendants do not dispute that decedent was suffering from an aortic dissection on February 13, 2004.  Instead, they contend that they did not deviate from the applicable standards in their care and treatment of decedent.  The record contains a consultation note from a cardiac surgeon on March 1, 2004 stating that decedent had an "old"

aortic dissection that was in existence "at least to 2/15."  Further, defendants do not dispute on this record that, with a timely diagnosis of aortic dissection and appropriate treatment, decedent would have had a substantial likelihood of avoiding catastrophic injury and premature death.

Two days after his initial visit, decedent returned to the emergency room at Kaleida and was again treated by James.  Decedent complained of back pain that was at a level of severity of "10/10" and felt as though "a baseball bat hit [him]."  Decedent was discharged by James 30 minutes later with a "diagnosis" of "sciatica."  Forty-four minutes later, while waiting for his wife to pick him up from the emergency room, decedent experienced "excruciating sudden [right] flank and [left] abdominal pain[]" and returned to the emergency room.  Ultimately, James ordered a CT scan without contrast.  The CT scan did not confirm James's preliminary diagnosis of kidney stones, and the radiologist's report recommended that the test be repeated with contrast.  Notwithstanding that recommendation, James did not order another CT scan.  Although the CT scan performed without contrast did not reveal the presence of any kidney stones, James discharged decedent from the emergency room with the "impression" that decedent had "sciatica/[left] renal stones."

One day later, decedent was admitted to defendant Mercy Ambulatory Care Center, a member facility of defendant Catholic Health System, Inc. (collectively, Mercy/CHS).  The triage information sheet incorrectly documented that decedent had seen and was catheterized by his urologist the day before.  In fact, decedent had not seen his urologist the day before, but had been catheterized at his second emergency room visit at Kaleida in three days after presenting at both visits with severe back pain.  Under the section entitled "past medical history," the triage information sheet referenced urinary retention, a coronary artery bypass graft a "few years ago" and eczema, but contained no reference to the back pain that led to decedent's two prior emergency room visits.  Decedent was treated by defendant Sadir Alrawi, M.D., an employee of defendant Buffalo Emergency Associates, LLP (BEA).  Alrawi did not note a "chief complaint" in decedent's emergency room treatment record (chart).  However, under the section of the chart entitled "[d]uration," Alrawi noted that decedent was experiencing "severe pain in the supra pubic area."  Decedent's two recent emergency room visits were not described in the chart.  Alrawi catheterized decedent's bladder and discharged him with a "secondary diagnosis" of urinary retention.  No "[p]rimary diagnosis" or "[d]ifferential diagnosis" was entered in decedent's chart by Alrawi or the staff at Mercy/CHS.

On February 18, 2004, decedent returned to the emergency room operated by Kaleida with complaints of lower back pain and the inability to feel or move his legs.  Imaging studies established that decedent had extensive internal bleeding in the area of his lumbar-thoracic spine with "mild mass effect on the adjacent spinal cord."  Ultimately, a CT scan with contrast performed on March 1, 2004 revealed an aortic dissection from the "proximal ascending aorta to [the] mid-abdomen."  Decedent's condition worsened over the next two

days, and he died on March 3, 2004.

We conclude that, although defendants met their initial burden on their respective motions, plaintiff raised triable issues of fact whether defendants deviated from the accepted standards of medical care and whether those deviations caused decedent's injuries and ultimate death. We note at the outset that Kaleida does not contend on appeal that it cannot be held vicariously liable for the acts of James, even though he was not a hospital employee (*see Mduba v Benedictine Hosp.*, 52 AD2d 450, 452). Thus, Kaleida is deemed to have abandoned any such contention (*see Ciesinski v Town of Aurora*, 202 AD2d 984, 984). With respect to James, plaintiff submitted the affidavit of a physician who is board certified in emergency medicine, in which the physician opined that aortic dissection is a "life-threatening" condition and should be promptly ruled out through further testing where, as here, the patient presents with a constellation of symptoms that are typical of that condition. He further opined that, given the information available to James, James's failure to consider and pursue a diagnosis of aortic dissection was a deviation from the relevant standard of care. Plaintiff's expert further opined that, on February 13 and 15, 2004, James departed from good and acceptable medical practice by, inter alia, failing to elicit a proper medical history from decedent and failing to include and pursue aortic dissection as a differential diagnosis for decedent. In particular, plaintiff's expert opined that the failure to order a CT scan with contrast on February 13 and 15 was a clear deviation from the accepted standards of medical care that deprived decedent of the opportunity for an accurate diagnosis and timely surgical intervention. The opinion of plaintiff's expert raised a triable issue of fact whether James departed from the accepted standards of medical care (*see Ryan v Santana*, 71 AD3d 1537, 1538; *cf. Imbierowicz v A.O. Fox Mem. Hosp.*, 43 AD3d 503, 505; *Blanar v Dickinson*, 296 AD2d 431, 432; *see generally Carter v New York City Health & Hosps. Corp.*, 47 AD3d 661, 663). Plaintiff's expert further stated that James's departures from the accepted standards of medical care were a substantial factor in causing decedent's injuries and his eventual death, and thereby raised triable issues of fact with respect to causation (*see Daugharty v Marshall*, 60 AD3d 1219, 1220-1222). With respect to the liability of Kaleida for the acts or omissions of its employees, plaintiff's expert opined that the failure of the triage nurse to record and report decedent's history of sudden onset of back pain, which began within 90 minutes of decedent's arrival at the emergency room, was a departure from the accepted standards of medical care and that the failure to diagnose and treat the aortic dissection was a direct consequence of that departure. In light of the foregoing, we conclude that the court properly denied the motions of James and Kaleida because the "motion papers presented a credibility battle between the parties' experts, and issues of credibility are properly left to a jury for its resolution" (*Barbuto v Winthrop Univ. Hosp.*, 305 AD2d 623, 624; *see generally Imbierowicz*, 43 AD3d at 505).

Mercy/CHS do not contend on appeal that they cannot be held vicariously liable for the alleged negligence of Alrawi (*see Mduba*, 52 AD2d at 454), and thus they are deemed to have abandoned any such

contention (*see Ciesinski*, 202 AD2d at 984). With respect to the treatment provided by the employees of Mercy/CHS, plaintiff's board certified emergency medicine expert opined that the triage nurse's inaccurate documentation of decedent's urology treatment history and symptoms, together with her failure to ascertain that decedent had experienced a sudden onset of back pain three days earlier resulting in two emergency room visits during that time frame, were deviations from the accepted standards of medical care. With respect to the treatment of decedent on February 16, 2004 that was provided by Alrawi, as an employee of BEA, at Mercy/CHS, plaintiff's expert opined that Alrawi incorrectly noted that decedent had a history of multiple catheters for urinary retention and failed to elicit an accurate medical history from decedent. Plaintiff's expert opined that, as a result, Alrawi incorrectly diagnosed decedent as having a "known case of [benign prostatic hypertrophy]." Further, plaintiff's expert opined that Alrawi failed to elicit an accurate and thorough history regarding decedent's two recent emergency room visits. Decedent's chart from the Mercy/CHS visit does not contain any indication that he was at the Kaleida emergency room on February 13, 2004. Although the Mercy/CHS chart indicates that decedent went to the Kaleida emergency room the day before, there is no indication of the reason why decedent was in the emergency room that day or what the discharge diagnosis was, if any. Further, Alrawi incorrectly wrote on decedent's chart that, when decedent was catheterized at the Kaleida emergency room, "no urine" was obtained. The Kaleida medical chart for decedent's February 15, 2004 visit, however, indicates that "1400 cc[s]" of urine were obtained from decedent as a result of the catheterization that day. According to plaintiff's expert, these deviations from the accepted standards of medical care resulted in Alrawi's failure to learn of decedent's prior complaints of severe lower back pain, Alrawi's misdiagnosis of "urinary retention," and his alleged negligent failure to diagnose and provide appropriate treatment for decedent's aortic dissection. We conclude that plaintiff's submissions raised a credibility dispute between the parties' experts and that the court properly concluded that issues of fact precluded summary judgment in favor of Alrawi, BEA, and Mercy/CHS (*see Barbuto*, 305 AD2d at 624).

We reject defendants' contention that the opinions of plaintiff's expert were conclusory, unfounded and speculative. The affidavits of plaintiff's expert with respect to each defendant were based upon the expert's review of decedent's medical records, medical history and the discovery material exchanged. Each of those affidavits "attest[ed] to a departure from accepted practice and contain[ed] the attesting [expert's] opinion that [the respective defendants'] omissions or departures were a competent producing cause of" decedent's injuries and death (*Latona v Roberson*, 71 AD3d 1498, 1499 [internal quotation marks omitted]; *see Bell v Ellis Hosp.*, 50 AD3d 1240, 1242; *Menzel v Plotnick*, 202 AD2d 558, 559).

In determining a summary judgment motion, "[i]ssue-finding, rather than issue-determination, is the key to the procedure" (*Esteve v Abad*, 271 App Div 725, 727; *see Sillman v Twentieth Century-Fox Film Corp.*, 3 NY2d 395, 404, *rearg denied* 3 NY2d 941), and we respectfully

submit that our dissenting colleague engaged in issue determination rather than issue finding. We note that our dissenting colleague relies upon the *absence* of entries in decedent's medical records with respect to an aortic dissection to support the theory that defendants did not deviate from accepted standards of emergency room care in their diagnosis and evaluation of decedent's symptoms. The entire crux of plaintiff's case, however, is that defendants prematurely abandoned or failed to pursue an appropriate differential diagnosis of aortic dissection. Thus, in our view, the absence of any reference in decedent's medical records to an aortic dissection is consistent with a claim of failure to diagnose.

Although the relevant medical care of decedent began on February 13, 2004, the first reference to an aortic dissection in his medical records is in a cardiothoracic surgeon's consultation note of March 1, 2004. Plaintiff's expert opined that, "[h]ad a dissection been diagnosed, cardio thoracic surgeons would be called to the ER to evaluate the patient," and, "[e]ven . . . 48 hours [after February 13, 2004], there was still a significant likelihood that surgery would have prevented hemorrhage into his spinal column and would have avoided the catastrophic injuries which [decedent], eventually, sustained, including his premature death." Although the dissent relies upon the cardiothoracic surgeon's consultation note to criticize the opinion of plaintiff's expert on causation, we note that the same consultation note states that the aortic dissection existed as early as February 15, 2004. We also note that our dissenting colleague concludes that the death certificate "contradicts" the opinion of plaintiff's expert. We conclude, however, that such "contradiction" supports our conclusion that there is a clear issue of fact.

We base our determination that plaintiff raised an issue of fact on the record as a whole; whereas, our dissenting colleague relies on select portions of decedent's medical records to support her conclusion that plaintiff failed to raise an issue of fact in opposition to the motions. For example, we note that, in criticizing the opinion of plaintiff's expert that the aortic dissection existed as early as February 13, 2004, the dissent relies on the entry in the death certificate stating that the aortic dissection existed for only a period of "days" prior to decedent's death on March 3, 2004.

We also note that the dissent fails to mention that decedent described his severe back pain, which started at 9:30 a.m. on February 13, 2004, as feeling like someone "hit [him with a] baseball bat." According to plaintiff's expert, the *sudden onset* of back pain of that nature and intensity is a telltale symptom of aortic dissection. Instead, the dissent discusses only that portion of the record wherein decedent also reported experiencing back pain that was of a qualitatively different nature and intensity two days earlier, and concludes that defendants acted reasonably in relying only upon that significantly different symptom.

In sum, we conclude that plaintiff raised issues of fact sufficient to defeat the motions for summary judgment dismissing the

amended complaint (*see Zuckerman v City of New York*, 49 NY2d 557, 562).

All concur except PERADOTTO, J., who dissents and votes to reverse in accordance with the following Memorandum:  I respectfully dissent. In my view, defendants-appellants (defendants) met their initial burden of establishing the absence of medical malpractice on their respective motions for summary judgment dismissing the amended complaint and all cross claims against them, and plaintiff failed to raise a triable issue of fact in opposition to the motions.  I would therefore reverse the order, grant the motions, and dismiss the amended complaint and all cross claims against defendants.

This matter arises from the care and treatment rendered to Steven R. Wilk (decedent) during four hospital visits that occurred over a period of six days in February 2004, which culminated in his admission to the hospital on February 18, 2004 and his death two weeks later.

On February 13, 2004, decedent was transported via ambulance to the emergency room at defendant Kaleida Health, doing business as Millard Fillmore Health System-Three Gates Circle Hospital (Kaleida). According to the ambulance record, decedent complained of lower back pain that began two days earlier and became "severe about 9:30" that morning.  He reported experiencing some relief with pain medication. Decedent was triaged at the hospital shortly after 11:00 a.m., and complained of sharp, constant pain in his lower back that increased with movement and radiated down both legs.  His prior medical history included coronary artery disease, coronary artery bypass graft surgery, aortic valve replacement, and hypertension.  Decedent's medications included Coumadin, an anticoagulant that was prescribed after his open heart surgery, and Lisinopril, which was prescribed to treat heart disease and hypertension.

At approximately 11:35 a.m., decedent was assessed by a nurse practitioner who was working under the supervision of defendant David M. James, M.D.  The nurse practitioner's notes indicate that decedent "complain[ed] of back pain which started suddenly two days ago after turning suddenly."  Decedent rated his pain as an 8 out of 10 on the pain scale, and indicated that it increased with movement and radiated down both legs.  Decedent reported that he had taken pain medication at 9:30 a.m., which had resulted in some relief, but that his pain persisted.  His "review of systems" was negative except for back pain, and his physical examination was normal.

The nurse practitioner ordered that decedent be given intravenous administration of pain medication, Prothrombin Time and International Normalized Ratio (PT/INR) testing to rule out an epidural bleed, and a thoracic spine X ray to rule out a fracture.  Decedent's INR level was "slightly . . . subtherapeutic," meaning that he was not at an increased risk of bleeding.  The X ray revealed moderate degenerative changes in decedent's thoracic spine, osteopenia, and "anterior wedging of T9 and L1 vertebral bodies."  By 12:00 p.m., decedent was walking without difficulty, and he reported that the pain medication had an "excellent effect" and that his pain level was a 1 out of 10.

He was discharged shortly thereafter with a diagnosis of thoracic strain, and was directed to follow up with his primary care physician within three to four days and to return to the hospital if his symptoms worsened or if he experienced loss of bladder or bowel control, which could indicate a neurological problem.

Two days later, on February 15, 2004, decedent returned to Kaleida complaining of lower back pain that radiated into his legs and was evaluated by Dr. James. Decedent reported that the pain medication and muscle relaxer that had been prescribed at the prior hospital visit "[p]rovided relief," but that on February 15 "[he] felt he had more pain into both upper thighs." Dr. James's review of systems was negative with the exception of back pain and, upon physical examination, Dr. James determined that decedent was in no acute distress and exhibited no sensory deficits. Dr. James noted possible diagnoses of sciatica or kidney stones. Decedent was discharged shortly thereafter with a prescription for a steroid to reduce inflammation. At the time of discharge, decedent reported a pain level of 3 out of 10, and his condition was described as stable.

While waiting for his wife to pick him up, decedent complained of sudden right flank and left abdominal pain. Dr. James ordered urinalysis and a CT scan of decedent's abdomen and pelvis, without contrast, to check for kidney stones. The CT scan revealed, inter alia, "[a] unilaterally enlarged left kidney with perinephric stranding"; atherosclerotic changes in the aortic, iliac, and femoral arteries; and a "[l]arge urinary bladder with mildly enlarged prostate, suggestive of outlet obstruction." As a result, Dr. James ordered that decedent have a Foley catheter inserted, after which 1,400 cubic centimeters of urine were released. Shortly thereafter, decedent reported that he "felt well," and he was discharged with a direction to follow up with his primary care doctor within one to two days.

The next day, decedent complained to his treating urologist that he was unable to urinate. Because it was after business hours, the urologist instructed decedent to go to the hospital to have a Foley catheter inserted. Decedent arrived at defendant Mercy Ambulatory Care Center, Inc., a member of defendant Catholic Health System (collectively, Mercy/CHS), at approximately 7:00 p.m. on February 16, 2004. Decedent told the triage nurse that he had been unable to urinate for more than 24 hours, and he reported a prior medical history of urinary retention. He further complained of pressure in his suprapubic area. Decedent was hemodynamically stable, with the exception that his blood pressure was elevated. Within 10 minutes of decedent's arrival at Mercy/CHS, a nurse inserted a Foley catheter and 1,000 cubic centimeters of urine were released.

Decedent was thereafter evaluated by defendant Sadir Alrawi, M.D., an employee of defendant Buffalo Emergency Associates, LLP. Dr. Alrawi's notes indicate that decedent was a "known case of BPH [benign prostatic hyperplasia]," i.e., enlarged prostate, and that he had been catheterized at Kaleida the day before. Decedent complained of severe pain in his suprapubic area——the area above his bladder——and an

inability to urinate.  Dr. Alrawi spoke to the on-call physician in the office of decedent's treating urologist, who indicated that decedent should remain catheterized and follow up with his urologist. Following catheterization, decedent's blood pressure returned to normal.  He was discharged at 10:30 p.m. in an "improved" condition and was instructed to "follow-up with [his urologist] in [the] morning."

Decedent did not follow up with his urologist as directed.  On February 18, 2004, decedent returned to Kaleida complaining of increased lower back pain that radiated into both legs and an inability to move his legs.  Upon evaluation, decedent reported a fever, fatigue, back and neck pain, paresthesias, gait disturbance, and focal weakness.  Decedent was admitted to the hospital under the care of a neurosurgeon with a principal diagnosis of paraplegia and secondary diagnoses of spinal hematoma and infarct, coagulopathy (bleeding disorder), and rheumatic heart disease.  Decedent had a significantly elevated INR level, and he was treated with vitamin K and fresh frozen plasma.  MRIs of decedent's spine, which were performed with and without contrast, revealed "extensive intraspinal signal abnormality suggesting an extensive hemorrhage."  That evening, decedent underwent a laminectomy in order to evacuate intradural clots in his thoracic and lumbar spine.

After the surgery, decedent experienced "transient improvement and then subsequently the loss of function bilaterally."  Imaging revealed "cord signal changes most consistent with swelling or infarction" and "an area of residual clot at the T10-11 level on the left-hand side, as well as an area within the [spinal column] and about the L3 level with suggestion of mass effect."  As a result, decedent underwent a second surgery on February 20, 2004 for a reevaluation of his thoracic and lumbar spine, and further removal of subdural hematomas.  Progress notes indicate that decedent improved somewhat after the second surgery and that decedent was to be transferred to a spinal cord rehabilitation center.  On March 1, 2004, however, decedent became acutely disoriented and short of breath.  A pulmonary embolism was suspected, and a head and chest CT scan with contrast was ordered.  The CT scan ruled out a pulmonary embolism, but revealed an aortic dissection.  There was, however, no hematoma, rupture, or leak around the aorta.  A cardiothoracic surgery consult note states that decedent's altered mental status likely resulted from "a thrombus (blood clot) on his mechanical aortic valve causing a small cerebral embolus."  The blood clot, in turn, resulted from a "lack of anticoagulation."

Decedent's condition deteriorated over the next two days, and he died on March 3, 2004.  The death certificate lists the immediate cause of death as "cerebral infarct with herniation" occurring within "hours" of decedent's death.  The cerebral infarct was "due to or as a consequence of" shock with intestinal ischemia beginning "days" before decedent's death which, in turn, was "due to or as a consequence of" aortic dissection, which likewise began "days" prior to decedent's death.  The certificate also lists "spinal cord infarct [secondary to] hematoma" as another "significant condition contributing to death but

not related to" the other listed causes.

Plaintiff commenced this medical malpractice and wrongful death action seeking damages for decedent's wrongful death and conscious pain and suffering.  In her bills of particulars, plaintiff broadly alleged that defendants were negligent in, inter alia, failing to adequately assess and monitor decedent, failing to properly examine and test decedent in a timely manner, and failing to properly diagnose decedent's condition.

After discovery, defendants moved for summary judgment dismissing the amended complaint and all cross claims against them.  As plaintiff correctly conceded below, each of the defendants met their initial burden on their respective motions of establishing "either the absence of any departure from good and accepted medical practice or that any departure was not the proximate cause of [decedent]'s alleged injuries" (*Shichman v Yasmer*, 74 AD3d 1316, 1318; *see O'Shea v Buffalo Med. Group, P.C.*, 64 AD3d 1140, 1140, *appeal dismissed* 13 NY3d 834).  Each defendant submitted the affidavit of an expert in which the expert opined that defendants did not deviate from accepted medical practice in their care and treatment of decedent, and that any acts or omissions on their part did not cause or contribute to decedent's death (*see Lake v Kaleida Health*, 59 AD3d 966, 966; *Darling v Scott*, 46 AD3d 1363, 1364).  In their affidavits, the experts directly addressed each of the allegations of negligence in plaintiff's bills of particulars (*see Abbotoy v Kurss*, 52 AD3d 1311, 1312, *lv denied* 55 AD3d 1421), and their opinions were supported by decedent's medical records and the deposition testimony of the medical professionals who treated decedent (*see Alvarez v Prospect Hosp.*, 68 NY2d 320, 325).

For example, with respect to the treatment rendered at Kaleida on February 13 and 15, 2004, Dr. James submitted the affidavit of a physician who is board certified in emergency medicine.  In the affidavit, the expert opined that the diagnosis of thoracic strain on February 13, 2004 was appropriate based on decedent's presentation, symptoms, and X ray results.  The expert noted that decedent's pain improved significantly upon the administration of non-narcotic pain medications—decedent had a pain level of 8 out of 10 upon arrival and a pain level of 1 out of 10 upon discharge—and that he was walking without difficulty at the time of discharge.  Decedent's INR level was "subtherapeutic," indicating that he was "not at risk for complications arising from the use of anticoagulation medication, such as bleeding."  Dr. James also submitted the deposition testimony of the nurse practitioner who treated decedent on February 13, 2004.  The nurse practitioner stated that decedent "presented with a classic history for muscle spasms," i.e., a sharp, sudden onset of pain that was constant and increased with movement.

As for the treatment rendered on February 15, 2004, the expert for Dr. James noted that decedent's neurological examination was normal, and that Dr. James properly referred to and relied upon decedent's INR reading from February 13.  According to the expert, the symptoms decedent experienced on February 15—urinary retention, flank pain, and abdominal pain—are consistent with a diagnosis of kidney

stones and that a CT scan without contrast is the proper test to confirm or rule out such a diagnosis. The expert opined that decedent's CT scan results were also consistent with a diagnosis of kidney stones inasmuch as the scan showed an enlarged left kidney, which is indicative of a "recent obstruction." According to the expert, decedent's "presentation" on February 15, 2004 was "not consistent with an epidural hematoma or aortic dissection."

Additionally, with respect to the treatment rendered to decedent on February 16, 2004 at Mercy/CHS, Dr. Alrawi submitted the affidavit of a physician who is board certified in emergency medicine. The expert opined that it was reasonable for Dr. Alrawi to conclude, based upon decedent's stated history and his physical examination, that decedent's suprapubic pain was the result of urinary retention related to BPH. The expert noted that, after catheterization, decedent's blood pressure returned to normal. The expert opined that, based on decedent's clinical presentation, his history, and the medications he reported taking, there was no reason for Dr. Alrawi to suspect bleeding or a spinal hematoma. The expert further opined with a reasonable degree of medical certainty that "the spinal hematoma that was diagnosed on February 18, 2004 most likely formed quickly and was not present at the time [decedent] was seen by Dr. Alrawi." The expert noted that a pathology report generated from a specimen obtained during decedent's February 18, 2004 laminectomy described an "organizing" blood clot, but did not indicate the presence of "old blood." In the expert's opinion, the pathology results indicate that it was "unlikely" that the spinal hematoma discovered on February 18, 2004 was present 48 hours earlier when decedent was seen at Mercy. The expert thus opined that it was reasonable for Dr. Alrawi to diagnose decedent with urinary retention; to treat that condition with catheterization, antibiotics, and pain medication; and to instruct decedent to follow up with his treating urologist. Indeed, Dr. Alrawi testified at his deposition that the most common cause of urinary retention is a prostatic condition, i.e., BPH.

Thus, inasmuch as defendants met their initial burden on their respective motions, the burden shifted to plaintiff to "raise triable issues of fact by submitting a physician's affidavit both attesting to a departure from accepted practice and containing the attesting [physician's] opinion that the defendant[s'] omissions or departures were a competent producing cause of the injury" (*O'Shea*, 64 AD3d at 1141 [internal quotation marks omitted]; *see Moran v Muscarella*, 85 AD3d 1579, 1580). It is well established that "[g]eneral allegations of medical malpractice, merely conclusory and unsupported by competent evidence tending to establish the essential elements of medical malpractice, are insufficient to defeat defendant[s'] . . . summary judgment motion[s]" (*Alvarez*, 68 NY2d at 325). Thus, "[w]here the expert's ultimate assertions are speculative or unsupported by any evidentiary foundation, . . . [his or her] opinion should be given no probative force and is insufficient to withstand summary judgment" (*Diaz v New York Downtown Hosp.*, 99 NY2d 542, 544).

Supreme Court concluded, and the majority agrees, that plaintiff raised a triable issue of fact in opposition to the motions. I

disagree.  In my view, the opposing affidavits of plaintiff's expert were conclusory and did not directly address or refute the prima facie showing in the detailed affidavits of defendants' experts (*see Foster-Sturrup v Long*, 95 AD3d 726, 728-729).  Moreover, plaintiff's expert relies upon a series of vague and speculative assumptions, which are unsupported or contradicted by the record.

The crux of the opinion of plaintiff's expert is that on February 13, 15, and 16, 2004, i.e., the dates of the alleged negligence herein, decedent was suffering from a "thoracic and abdominal aortic dissection," and that the undetected aortic dissection caused the cascade of medical events commencing with decedent's admission to the hospital on February 18, 2004 and terminating with his death several weeks later.  Plaintiff's expert opines that defendants' failure to diagnose that condition in a timely manner "deprived [decedent] of a chance at timely intervention for treatment of his aortic dissection before the vessel started to hemorrhage," and that "[a]ppropriate and timely emergency intervention would have, more probably than not, identified the presence of a dissecting thoracic and abdominal aorta which could have been surgically treated before causing spinal cord injury."

There is simply nothing in the medical records, however, to support the opinion of plaintiff's expert that decedent's symptoms on the dates at issue and his subsequent injuries were caused by a ruptured aortic dissection.  The voluminous medical records contain only two references to an aortic dissection, neither of which are specifically referred to in the affidavit of plaintiff's expert:  (1) a cardiothoracic surgery consultation note dated March 1, 2004; and (2) decedent's death certificate.  On March 1, 2004, which was more than two weeks after defendants' alleged negligence, decedent suddenly became disoriented and short of breath.  As a result, decedent underwent a CT scan of his head and chest, with contrast, for the purpose of ruling out a suspected pulmonary embolism.  No report from that CT scan appears in the record.  According to a handwritten cardiothoracic consultation note, however, the CT scan revealed an aortic dissection.  The majority relies upon the first part of the note, which states that a non-contrast CT scan performed approximately two weeks earlier shows "calcification at the center of the aorta at [approximately] diaphragmatic level.  This suggests the dissection is old (at least to 2/15)," i.e., the date of the prior CT scan.  The remainder of the note, however, concludes that there was "no hematoma, rupture or leak around the aorta" and, indeed, that there was "[n]o evidence of rupture/impending rupture."  That statement undercuts the theory of plaintiff's expert that plaintiff's injuries were caused by a hemorrhage or rupture of the aorta.  Indeed, the note proceeds to state that the aortic dissection was "probabl[y] old . . . , most likely occurring" after decedent's 2002 aortic valve replacement surgery.  According to the note, decedent's altered mental state likely resulted from a cerebral embolus caused by a thrombus, i.e., a blood clot, on decedent's mechanical aortic valve, which in turn resulted from a lack of anticoagulation therapy.  Plaintiff's expert fails to address that information.  The only other reference to an aortic dissection is found in the death certificate, which lists

"aortic dissection" as one of the secondary causes of death. According to the death certificate, however, that condition existed for only a period of "days" prior to decedent's death on March 3, 2004, which contradicts the conclusion of plaintiff's expert that decedent suffered from an aortic dissection as early as February 13, 2004.  Further, the death certificate lists "spinal cord infarct [secondary to] hematoma"—the condition for which decedent was admitted to the hospital on February 18, 2004—as another "significant condition contributing to death *but not related to*" (emphasis added) the primary and secondary causes of death, including the aortic dissection.

Even assuming, arguendo, that decedent's injuries and death were caused by a rupturing aortic dissection and that such condition was present on the relevant treatment dates, it is my view that plaintiff's expert failed to set forth an evidentiary basis for his or her opinion that defendants should have diagnosed the alleged aortic dissection on those dates (*see Bendel v Rajpal*, 101 AD3d 662, 663-664; *Altmann v Molead*, 51 AD3d 482, 483; *Holbrook v United Hosp. Medical Center*, 248 AD2d 358, 358-359).  As noted above, an aortic dissection was not "diagnosed" until March 1, 2004, which was 13 days after decedent was admitted to the hospital.  During those 13 days, decedent underwent two spinal surgeries, received MRIs with and without contrast of his lumber, cervical, and thoracic spine, and was under the constant care of a neurosurgeon, yet there is no mention in the medical records of an aortic dissection or a dissecting aortic aneurysm during that period.  Plaintiff's expert nonetheless concludes that a "[r]eview of all of [decedent's] records confirms that the true cause for the onset of [his] back pain was an aortic dissection."

In support of that conclusion, plaintiff's expert focused on what he or she characterized as a "discrepancy" between the patient history documented on the February 13, 2004 ambulance record and the patient history recorded by Kaleida staff on that date—a characterization that is adopted by the majority.  Specifically, plaintiff's expert stated that the Kaleida nurse practitioner ruled out a differential diagnosis of aortic dissection "solely on the basis of an erroneous description of the patient's true history," which resulted in a series of errors culminating in decedent's "premature[] discharge[] on an erroneous diagnosis of thoracic muscle strain."  The expert's opinion, however, is based upon the faulty premise that decedent's pain began only 90 minutes prior to his arrival at the emergency room, i.e., at 9:30 a.m. on February 13, 2004.  The majority similarly states that decedent's back pain "started at 9:30 a.m."  That statement, however, is based upon a misreading of the ambulance record.  In fact, the ambulance record states that decedent's pain became "*severe* about 9:30 [a.m.]" (emphasis added).  In the "comments" section of the ambulance record, the paramedic further indicated that decedent's pain "started [two] days ago."  Thus, when read in its entirety, the ambulance record indicates that decedent's back pain began two days before his first emergency room visit, i.e., on February 11, 2004, and that it increased in intensity on the morning of February 13, 2004, thereby prompting that hospital visit.  Indeed, plaintiff's own bills of particulars unequivocally state that decedent's pain began on February 11, 2004.

The nurse practitioner testified at her deposition that, in her experience, patients who "have had a dissecting aneurysm, do not have pain for two days prior to ending up in an emergency room." That testimony was undisputed. In any event, contrary to the assertion of the majority, the nurse practitioner did not rule out an aortic dissection solely on the basis of the reported duration of decedent's pain. Rather, the nurse practitioner testified at her deposition that she excluded an abdominal aortic aneurysm based upon her physical examination of decedent, decedent's description of his pain, and the fact that decedent's pain was relieved by the course of treatment that she prescribed. Decedent reported that the pain began when he turned suddenly, and he described the pain as a sharp, constant pain that increased with movement and radiated into his legs, which the nurse practitioner described as "very spasmatic sounding in nature." By contrast, the nurse practitioner testified that patients suffering from a dissecting aneurysm describe the sensation as a "ripping-like pain and not a sharp, sudden onset [of] pain," and that those patients generally have pain in other areas of their body. Upon physical examination, decedent was in no acute distress and exhibited no neurological or cardiovascular symptoms. Significantly, decedent's abdominal examination was normal with no tenderness or abnormal vascular sounds, including within the aortic vessel. Further, decedent responded well to non-narcotic pain medication, which the nurse practitioner testified was inconsistent with an aortic dissection. Finally, the nurse practitioner testified that decedent's thoracic spine X ray supported her diagnosis. Significantly, plaintiff's expert did not dispute any of that information.

With respect to the treatment rendered to decedent on February 15, 2004, plaintiff's expert concludes that Kaleida deviated from the relevant standard of care in failing to order a CT scan with contrast based upon decedent's "constellation of signs and symptoms." Notably, plaintiff's expert does not opine that the alleged "constellation" of symptoms warranting a CT scan with contrast were signs of an aortic dissection or that a CT scan with contrast performed on that date would have revealed such a dissection. In any event, many of the "signs and symptoms" plaintiff's expert relies upon are simply not supported by the record. For example, the expert averred that decedent had "no history of back trauma" when, in fact, decedent reported that his back pain began when he turned suddenly on February 11, 2004. Also, contrary to the expert's assertion that decedent's "pain was not relieved by prescription pain medications over the preceding [48] hours," the record establishes that decedent's pain improved significantly following the administration of pain medication on February 13, 2004 and February 15, 2004. Finally, plaintiff's expert concluded that a CT scan with contrast was indicated because the non-contrast scan "had ruled-out obstructive kidney stones." Dr. James's expert, however, opined that the CT scan findings suggested a "probable kidney stone" and noted that the report referenced an enlarged left kidney, which is consistent with a recent obstruction. Plaintiff also failed to refute that opinion.

Finally, with respect to the treatment rendered at Mercy/CHS on February 16, 2004, plaintiff's expert opined that "from a

comprehensive review of all of the other records of [decedent]'s treatment, it is clear that, at the time of his [Mercy/CHS] visit, [decedent] was experiencing a thoracic and abdominal aortic dissection.  At the two (2) preceding ER visits, he had complained of intractable severe low back pain which is entirely consistent with his severe dissection.  But, the [Mercy/CHS] record is devoid of documented physical findings suggestive of this condition.  It is inconceivable that this evolving condition did not continue to cause detectable problems for [decedent] on February 16, 2004.  When [the Mercy/CHS defendants] made no findings consistent with this problem, and, when all of them remained oblivious to this underlying condition, these facts more likely support a conclusion that the examinations were not properly performed, than that the condition had become asymptomatic."

As discussed in detail with respect to the Kaleida defendants, plaintiff's expert provides no basis for the hindsight determination that decedent was in fact suffering from an aortic dissection on February 16, 2004.  Further, plaintiff's expert faults Mercy/CHS for failing to document findings consistent with that condition, i.e., "intractable" back pain, when there is no evidence that decedent had or complained of back pain on that date.  Instead, the records reflect that his primary complaint was urinary retention and pain or discomfort in his suprapubic region.  Unlike his visits to Kaleida on February 13 and 15, 2004, decedent went to Mercy/CHS as a walk-in patient, upon the direction of his treating urologist, for the purpose of having a Foley catheter inserted in order to relieve his complaints of urinary retention.  As noted, at the time of his Mercy/CHS visit, decedent was hemodynamically stable, but for the fact that his blood pressure was elevated before he was catheterized.  After the catheter was inserted and 1,000 cubic centimeters of urine were released, decedent's blood pressure returned to normal and his condition improved.  Following a consultation with decedent's urologist, Mercy/CHS discharged decedent with the catheter in place and instructed him to follow up with the urologist the next day.  Decedent did not do so.  Thus, contrary to the opinion of plaintiff's expert, there was nothing to suggest that decedent was suffering from an aortic dissection at that time.

In sum, as the court found and plaintiff concedes, defendants established as a matter of law that they did not deviate from the standard of emergency medical care on February 13, 15, or 16, 2004 and that, in any event, any alleged deviations did not cause decedent's subsequent injuries and his death more than two weeks later.  In opposition to the motions, plaintiff submitted the affidavit of an expert in which the expert made conclusory assertions of negligence and proximate cause, which were either unsupported by or contradicted by the record, and thus failed to raise a triable issue of fact (*see Holbrook*, 248 AD2d at 358-359; *see also Mignoli v Oyugi*, 82 AD3d 443, 444; *Altmann*, 51 AD3d at 483; *Hernandez-Vega v Zwanger-Pesiri Radiology Group*, 39 AD3d 710, 711-712).  I would therefore reverse the order, grant defendants' respective motions for summary judgment, and dismiss the amended complaint and all cross claims against them (*see*

*Moran v Muscarella*, 87 AD3d 1299, 1300).