Appeals from an order of the Supreme Court, Erie County (Patrick H. NeMoyer, J.), entered July 14, 2011 in a medical malpractice action. The order denied the motions of defendants David M. James, M.D., Kaleida Health, doing business as Millard Fillmore Health System-Three Gates Circle Hospital, Sadir Alrawi, M.D., Mercy Ambulatory Care Center, Catholic Health System, Inc., and Buffalo Emergency Associates, LLP for summary judgment dismissing the amended complaint and all cross claims against them.
*1481 It is hereby ordered that the order so appealed from is affirmed without costs.
Memorandum: Plaintiff commenced this medical malpractice and wrongful death action seeking damages for the conscious pain and suffering, and death of Steven R. Wilk (decedent) as a result of the alleged failure by defendants to diagnose and treat decedent’s aortic dissection in a timely manner. The death certificate revealed that the immediate cause of death was a “cerebral infarct with herniation[,] . . . due to or as a consequence of . . . shock with intestinal ischemia[,] . . . due to or as a consequence of. . . aortic dissection.” Defendants-appellants (defendants) moved for summary judgment dismissing the amended complaint and all cross claims against them and, although Supreme Court concluded that defendants met their initial burden on their respective motions, the court determined that plaintiff’s submissions raised issues of fact. Thus, the court denied the motions. We affirm.
On February 13, 2004, decedent was transported by ambulance to the emergency room operated by defendant Kaleida Health, doing business as Millard Fillmore Health System-Three Gates Circle Hospital (Kaleida), and was treated by defendant David M. James, M.D. and Kaleida’s staff. The ambulance record indicated that decedent’s “chief complaint” was “severe back pain” that, according to the “subjective assessment” entry on that record, started at 9:30 a.m. and felt like someone “hit [him with a] baseball bat.” However, the “comments” section of the ambulance record contains an entry stating that the pain started “2 days ago.” The triage nurse at Kaleida, a hospital employee, documented a “2 day [history] of lower back pain,” but did not document decedent’s complaint that the severe back pain started within 90 minutes of his arrival at the emergency room. Thus, decedent’s report of the sudden onset of severe back pain was not carried forward from the ambulance record to the triage note in his medical chart at Kaleida. It is undisputed that the sudden onset of severe back pain is a telltale symptom of aortic dissection.
The nurse practitioner who initially assessed decedent upon his arrival at the emergency room testified at her deposition that she reviewed the triage note to obtain information about the history of decedent’s onset of pain and that it did not indicate that the pain had started suddenly at 9:30 a.m. that morning. The nurse practitioner did not recall whether she reviewed the ambulance record when she saw decedent in the emergency room. The nurse practitioner also testified that decedent’s symptoms supported a differential diagnosis of aortic *1482 dissection. She agreed that the appropriate diagnostic test to rule out an aortic dissection was a CT scan with contrast. Nonetheless, a CT scan was neither ordered nor performed, and decedent was discharged with a diagnosis of “thoracic spine strain.” The nurse practitioner explained at her deposition that she abandoned the differential diagnosis of aortic dissection because, in her experience, patients who “have had a dissecting aneurism, do not have pain for two days prior to ending up in the emergency room.” Notably, defendants do not dispute that decedent was suffering from an aortic dissection on February 13, 2004. Instead, they contend that they did not deviate from the applicable standards in their care and treatment of decedent. The record contains a consultation note from a cardiac surgeon on March 1, 2004 stating that decedent had an “old” aortic dissection that was in existence “at least to 2/15.” Further, defendants do not dispute on this record that, with a timely diagnosis of aortic dissection and appropriate treatment, decedent would have had a substantial likelihood of avoiding catastrophic injury and premature death.
Two days after his initial visit, decedent returned to the emergency room at Kaleida and was again treated by James. Decedent complained of back pain that was at a level of severity of “10/10” and felt as though “a baseball bat hit [him].” Decedent was discharged by James 30 minutes later with a “diagnosis” of “sciatica.” Forty-four minutes later, while waiting for his wife to pick him up from the emergency room, decedent experienced “excruciating sudden [right] flank and [left] abdominal pain[ ]” and returned to the emergency room. Ultimately, James ordered a CT scan without contrast. The CT scan did not confirm James’s preliminary diagnosis of kidney stones, and the radiologist’s report recommended that the test be repeated with contrast. Notwithstanding that recommendation, James did not order another CT scan. Although the CT scan performed without contrast did not reveal the presence of any kidney stones, James discharged decedent from the emergency room with the “impression” that decedent had “sciatica/[left] renal stones.”
One day later, decedent was admitted to defendant Mercy Ambulatory Care Center, a member facility of defendant Catholic Health System, Inc. (collectively, Mercy/CHS). The triage information sheet incorrectly documented that decedent had seen and was catheterized by his urologist the day before. In fact, decedent had not seen his urologist the day before, but had been catheterized at his second emergency room visit a.t Kaleida in three days after presenting at both visits with severe back *1483 pain. Under the section entitled “past medical history,” the triage information sheet referenced urinary retention, a coronary artery bypass graft a “few years ago” and eczema, but contained no reference to the back pain that led to decedent’s two prior emergency room visits. Decedent was treated by defendant Sadir Alrawi, M.D., an employee of defendant Buffalo Emergency Associates, LLP (BEA). Alrawi did not note a “chief complaint” in decedent’s emergency room treatment record (chart). However, under the section of the chart entitled “[d]uration,” Alrawi noted that decedent was experiencing “severe pain in the, suprapubic area.” Decedent’s two recent emergency room visits were not described in the chart. Alrawi catheterized decedent’s bladder and discharged him with a “secondary diagnosis” of urinary retention. No “[pjrimary diagnosis” or “[differential diagnosis” was entered in decedent’s chart by Alrawi or the staff at Mercy/CHS.
On February 18, 2004, decedent returned to the emergency room operated by Kaleida with complaints of lower back pain and the inability to feel or move his legs. Imaging studies established that decedent had extensive internal bleeding in the area of his lumbar-thoracic spine with “mild mass effect on the adjacent spinal cord.” Ultimately, a CT scan with contrast performed on March 1, 2004 revealed an aortic dissection from the “proximal ascending aorta to [the] mid-abdomen.” Decedent’s condition worsened over the next two days, and he died on March 3, 2004.
We conclude that, although defendants met their initial burden on their respective motions, plaintiff raised triable issues of fact whether defendants deviated from the accepted standards of medical care and whether those deviations caused decedent’s injuries and ultimate death. We note at the outset that Kaleida does not contend on appeal that it cannot be held vicariously liable for the acts of James, even though he was not a hospital employee (see Mduba v Benedictine Hosp., 52 AD2d 450, 452 [1976]). Thus, Kaleida is deemed to have abandoned any such contention (see Ciesinski v Town of Aurora, 202 AD2d 984, 984 [1994]). With respect to James, plaintiff submitted the affidavit of a physician who is board certified in emergency medicine, in which the physician opined that aortic dissection is a “life-threatening” condition and should be promptly ruled out through further testing where, as here, the patient presents with a constellation of symptoms that are typical of that condition. He further opined that, given the information available to James, James’s failure to consider and pursue a diagnosis of aortic dissection was a deviation from the relevant standard of *1484 care. Plaintiff’s expert further opined that, on February 13 and 15, 2004, James departed from good and acceptable medical practice by, inter alia, failing to elicit a proper medical history from decedent and failing to include and pursue aortic dissection as a differential diagnosis for decedent. In particular, plaintiffs expert opined that the failure to order a CT scan with contrast on February 13 and 15 was a clear deviation from the accepted standards of medical care that deprived decedent of the opportunity for an accurate diagnosis and timely surgical intervention. The opinion of plaintiffs expert raised a triable issue of fact whether James departed from the accepted standards of medical care (see Ryan v Santana, 71 AD3d 1537, 1538 [2010]; cf. Imbierowicz v A.O. Fox Mem. Hosp., 43 AD3d 503, 505 [2007]; Blanar v Dickinson, 296 AD2d 431, 432 [2002]; see generally Carter v New York City Health & Hosps. Corp., 47 AD3d 661, 663 [2008]). Plaintiffs expert further stated that James’s departures from the accepted standards of medical care were a substantial factor in causing decedent’s injuries and his eventual death, and thereby raised triable issues of fact with respect to causation (see Daugharty v Marshall, 60 AD3d 1219, 1220-1222 [2009]). With respect to the liability of Kaleida for the acts or omissions of its employees, plaintiffs expert opined that the failure of the triage nurse to record and report decedent’s history of sudden onset of back pain, which began within 90 minutes of decedent’s arrival at the emergency room, was a departure from the accepted standards of medical care and that the failure to diagnose and treat the aortic dissection was a direct consequence of that departure. In light of the foregoing, we conclude that the court properly denied the motions of James and Kaleida because the “motion papers presented a credibility battle between the parties’ experts, and issues of credibility are properly left to a jury for its resolution” (Barbuto v Winthrop Univ. Hosp., 305 AD2d 623, 624 [2003]; see generally Imbierowicz, 43 AD3d at 505).
Mercy/CHS do not contend on appeal that they cannot be held vicariously liable for the alleged negligence of Alrawi (see Mduba, 52 AD2d at 454), and thus they are deemed to have abandoned any such contention (see Ciesinski, 202 AD2d at 984). With respect to the treatment provided by the employees of Mercy/CHS, plaintiffs board certified emergency medicine expert opined that the triage nurse’s inaccurate documentation of decedent’s urology treatment history and symptoms, together with her failure to ascertain that decedent had experienced a sudden onset of back pain three days earlier resulting in two emergency room visits during that time frame, were deviations from the accepted standards of medical care. With respect to the *1485 treatment of decedent on February 16, 2004 that was provided by Alrawi, as an employee of BE A, at Mercy/CHS, plaintiff’s expert opined that Alrawi incorrectly noted that decedent had a history of multiple catheters for urinary retention and failed to elicit an accurate medical history from decedent. Plaintiff’s expert opined that, as a result, Alrawi incorrectly diagnosed decedent as having a “known case of [benign prostatic hypertrophy].” Further, plaintiff’s expert opined that Alrawi failed to elicit an accurate and thorough history regarding decedent’s two recent emergency room visits. Decedent’s chart from the Mercy/CHS visit does not contain any indication that he was at the Kaleida emergency room on February 13, 2004. Although the Mercy/CHS chart indicates that decedent went to the Kaleida emergency room the day before, there is no indication of the reason why decedent was in the emergency room that day or what the discharge diagnosis was, if any. Further, Alrawi incorrectly wrote on decedent’s chart that, when decedent was catheterized at the Kaleida emergency room, “no urine” was obtained. The Kaleida medical chart for decedent’s February 15, 2004 visit, however, indicates that “1400 cc[s]” of urine were obtained from decedent as a result of the catheterization that day. According to plaintiffs expert, these deviations from the accepted standards of medical care resulted in Alrawi’s failure to learn of decedent’s prior complaints of severe lower back pain, Alrawi’s misdiagnosis of “urinary retention,” and his alleged negligent failure to diagnose and provide appropriate treatment for decedent’s aortic dissection. We conclude that plaintiffs submissions raised a credibility dispute between the parties’ experts and that the court properly concluded that issues of fact precluded summary judgment in favor of Alrawi, BEA, and Mercy/CHS (see Barbuto, 305 AD2d at 624).
We reject defendants’ contention that the opinions of plaintiffs expert were conclusory, unfounded and speculative. The affidavits of plaintiffs expert with respect to each defendant were based upon the expert’s review of decedent’s medical records, medical history and the discovery material exchanged. Each of those affidavits “attest[ed] to a departure from accepted practice and contain[ed] the attesting [expert’s] opinion that [the respective defendants’] omissions or departures were a competent producing cause of’ decedent’s injuries and death (Latona v Roberson, 71 AD3d 1498, 1499 [2010] [internal quotation marks omitted]; see Bell v Ellis Hosp., 50 AD3d 1240, 1242 [2008]; Menzel v Plotnick, 202 AD2d 558, 559 [1994]).
In determining a summary judgment motion, “[ijssue-finding, rather than issue-determination, is the key to the procedure” *1486 (Esteve v Abad, 271 App Div 725, 727 [1947]; see Sillman v Twentieth Century-Fox Film Corp., 3 NY2d 395, 404 [1957], rearg denied 3 NY2d 941 [1957]), and we respectfully submit that our dissenting colleague engaged in issue determination rather than issue finding. We note that our dissenting colleague relies upon the absence of entries in decedent’s medical records with respect to an aortic dissection to support the theory that defendants did not deviate from accepted standards of emergency room care in their diagnosis and evaluation of decedent’s symptoms. The entire crux of plaintiffs case, however, is that defendants prematurely abandoned or failed to pursue an appropriate differential diagnosis of aortic dissection. Thus, in our view, the absence of any reference in decedent’s medical records to an aortic dissection is consistent with a claim of failure to diagnose.
Although the relevant medical care of decedent began on February 13, 2004, the first reference to an aortic dissection in his medical records is in a cardiothoracic surgeon’s consultation note of March 1, 2004. Plaintiffs expert opined that, “[h]ad a dissection been diagnosed, cardio thoracic surgeons would be called to the ER to evaluate the patient,” and, “[e]ven ... 48 hours [after February 13, 2004], there was still a significant likelihood that surgery would have prevented hemorrhage into his spinal column and would have avoided the catastrophic injuries which [decedent], eventually, sustained, including his premature death.” Although the dissent relies upon the cardiothoracic surgeon’s consultation note to criticize the opinion of plaintiffs expert on causation, we note that the same consultation note states that the aortic dissection existed as early as February 15, 2004. We also note that our dissenting colleague concludes that the death certificate “contradicts” the opinion of plaintiffs expert. We conclude, however, that such “contradiction” supports our conclusion that there is a clear issue of fact.
We base our determination that plaintiff raised an issue of fact on the record as a whole; whereas, our dissenting colleague relies on select portions of decedent’s medical records to support her conclusion that plaintiff failed to raise an issue of fact in opposition to the motions. For example, we note that, in criticizing the opinion of plaintiffs expert that the aortic dissection existed as early as February 13, 2004, the dissent relies on the entry in the death certificate stating that the aortic dissection existed for only a period of “days” prior to decedent’s death on March 3, 2004.
We also note that the dissent fails to mention that decedent *1487 described his severe back pain, which started at 9:30 a.m. on February 13, 2004, as feeling like someone “hit [him with a] baseball bat.” According to plaintiffs expert, the sudden onset of back pain of that nature and intensity is a telltale symptom of aortic dissection. Instead, the dissent discusses only that portion of the record wherein decedent also reported experiencing back pain that was of a qualitatively different nature and intensity two days earlier, and concludes that defendants acted reasonably in relying only upon that significantly different symptom.
In sum, we conclude that plaintiff raised issues of fact sufficient to defeat the motions for summary judgment dismissing the amended complaint (see Zuckerman v City of New York, 49 NY2d 557, 562 [1980]).
All concur except Peradotto, J., who dissents and votes to reverse in accordance with the following memorandum.