# SUPREME COURT OF THE STATE OF NEW YORK
## *Appellate Division, Fourth Judicial Department*

**401**

**CA 12-02019**

PRESENT: SMITH, J.P., FAHEY, PERADOTTO, AND LINDLEY, JJ.

---

JOANNE WILK, AS ADMINISTRATRIX OF THE ESTATE
OF STEVEN R. WILK, DECEASED,
PLAINTIFF-RESPONDENT,

V                                          MEMORANDUM AND ORDER

DAVID M. JAMES, M.D., ET AL., DEFENDANTS,
LOUIS R. BAUMANN, M.D., CARLO M. PERFETTO, M.D.
AND WESTERN NEW YORK UROLOGY ASSOCIATES, LLC,
DEFENDANTS-APPELLANTS.

---

CONNORS & VILARDO, LLP, BUFFALO (JOHN T. LOSS OF COUNSEL), FOR
DEFENDANTS-APPELLANTS.

HAMSHER & VALENTINE, BUFFALO (RICHARD P. VALENTINE OF COUNSEL), FOR
PLAINTIFF-RESPONDENT.

---------------------------------------------------------------------------------------------------------------

Appeal from an order of the Supreme Court, Erie County (Patrick
H. NeMoyer, J.), entered August 23, 2012. The order denied the motion
of defendants Louis R. Baumann, M.D., Carlo M. Perfetto, M.D. and
Western New York Urology Associates, LLC, for summary judgment
dismissing the amended complaint and all cross claims against them.

It is hereby ORDERED that the order so appealed from is reversed
on the law without costs, the motion is granted, and the amended
complaint and all cross claims against defendants Louis R. Baumann,
M.D., Carlo M. Perfetto, M.D., and Western New York Urology
Associates, LLC are dismissed.

Memorandum: Plaintiff, as administratrix of the estate of her
husband (decedent), commenced this medical malpractice and wrongful
death action seeking damages for the alleged negligence of defendants
in their care and treatment of decedent. Defendants Louis R. Baumann,
M.D., Carlo M. Perfetto, M.D., and Western New York Urology
Associates, LLC (hereafter, defendants), appeal from an order denying
their motion for summary judgment dismissing the amended complaint and
all cross claims against them. We reverse.

At approximately 2:42 p.m. on February 16, 2004, decedent called
the office of Dr. Perfetto, his treating urologist, and spoke to a
secretary. Decedent told the secretary that he went to the emergency
room the day before, that he "ha[d] stones," and that he was "in a lot
of pain." The secretary relayed the message to a medical assistant,
who called decedent back at 3:08 p.m. Decedent's line was busy. The

medical assistant called decedent again at 4:26 p.m. and left a message for decedent.  At 4:43 p.m., decedent returned the call and spoke to the medical assistant.  The medical assistant's notes from that conversation indicate that decedent told her that he had gone to the emergency room the day before due to lower back pain and that he was told that he had "stones."  Decedent also experienced urinary retention at that time, which was treated with a catheter.  Decedent told the medical assistant that he had not urinated since being catheterized and that his back pain was a 7 out of 10 on the pain scale.  Those notes were forwarded to Dr. Perfetto, and the medical assistant contacted the hospital to obtain decedent's X ray and CT scan results.

At 4:58 p.m., the medical assistant received a CT scan of decedent's abdomen taken on February 15, 2004 and forwarded it to Dr. Baumann, the on-call urologist.  Western New York Urology Associates, LLC had a practice of "bring[ing]" patients who were unable to urinate into the office without speaking first with a physician.  In accordance with that policy, the medical assistant advised decedent to come to the office for possible catheterization.  At 5:23 p.m., the medical assistant notified Dr. Perfetto that decedent was on his way to the office.  Dr. Perfetto reviewed the medical assistant's message as well as the CT scan report, and advised her that because the office lacked sufficient staff to assist him with the catheterization at that time, decedent should instead go to the emergency room to have a Foley catheter inserted.  He further advised the medical assistant that decedent should make a follow-up appointment with him or the nurse practitioner.  At 5:55 p.m., the medical assistant noted that she instructed decedent to go to Mercy Ambulatory Care Center (MACC) for "evaluation catheter insertion," notified MACC that he was coming, and further instructed decedent to schedule a follow-up appointment.  Decedent arrived at MACC at 7:10 p.m., complaining of urinary retention and pain and pressure in his suprapubic area.  Decedent's blood pressure was elevated; otherwise, he was hemodynamically stable.  A Foley catheter was inserted and 1,000 cubic centimeters of urine were released.  Thereafter, decedent's blood pressure returned to normal and, after consulting with Dr. Baumann, MACC discharged decedent with the catheter in place, and advised him to increase his fluid intake and to follow up with Dr. Perfetto the next day.  Decedent, however, did not contact Dr. Perfetto.  Instead, on February 18, 2004, decedent was transported via ambulance to the emergency room due to complaints of increased pain and inability to feel or move his legs, and was admitted for neurosurgical evaluation.  An MRI revealed a spinal epidural hematoma at L2 through L5 and a clot at T11 through T12, and decedent underwent an emergency "T7-L4 laminectomy with the evacuation of intradural spinal hematoma."

The day after the surgery, decedent's motor examination declined, and another MRI revealed a reaccumulation of the clot.  As a result, on February 20, 2004, decedent underwent a second surgery for "re-exploration and re-evacuation of his intradural clot."  Decedent's condition slowly improved, and he was scheduled to be transferred to a spinal cord injury rehabilitation center.  At approximately noon on March 1, 2004, however, decedent's condition suddenly deteriorated,

and he died on March 3, 2004.  The death certificate lists the immediate cause of death as "cerebral infarct with herniation" occurring within "hours" of decedent's death.  The cerebral infarct was "due to or as a consequence of" shock with intestinal ischemia beginning "days" before decedent's death that, in turn, was "due to or as a consequence of" aortic dissection, which likewise began "days" prior to decedent's death.  The death certificate also lists "spinal cord infarct [secondary to] hematoma" as another significant condition contributing to his death.

As plaintiff correctly concedes, defendants met their initial burden on the motion by establishing "the absence of any departure from good and accepted medical practice [and] that any departure was not the proximate cause of [decedent]'s alleged injuries" and eventual death (*Shichman v Yasmer*, 74 AD3d 1316, 1318; *see O'Shea v Buffalo Med. Group, P.C.*, 64 AD3d 1140, 1140, *appeal dismissed* 13 NY3d 834). Dr. Perfetto and Dr. Baumann each submitted their own affidavit opining, with a reasonable degree of medical certainty, that they did not deviate from accepted urological practice, and that any acts or omissions on their part did not cause or contribute to decedent's death, which occurred over two weeks after their treatment of decedent (*see Lake v Kaleida Health*, 59 AD3d 966, 966; *Darling v Scott*, 46 AD3d 1363, 1364).  The physicians' affidavits directly address each of the allegations of negligence in plaintiff's bills of particulars (*see Abbotoy v Kurss*, 52 AD3d 1311, 1312), and their opinions are supported by decedent's medical records and excerpts from the autopsy report (*see Alvarez v Prospect Hosp.*, 68 NY2d 320, 325).

The burden thus shifted to plaintiff to "raise triable issues of fact by submitting a physician's affidavit both attesting to a departure from accepted practice and containing the attesting [physician's] opinion that the defendant[s'] omissions or departures were a competent producing cause of the injury" (*O'Shea*, 64 AD3d at 1141 [internal quotation marks omitted]; *see Moran v Muscarella*, 85 AD3d 1579, 1580).  It is well settled that "[g]eneral allegations of medical malpractice, merely conclusory and unsupported by competent evidence tending to establish the essential elements of medical malpractice, are insufficient to defeat defendant[s'] . . . summary judgment motion" (*Alvarez*, 68 NY2d at 325).  Thus, "[w]here the expert's ultimate assertions are speculative or unsupported by any evidentiary foundation, . . . [his or her] opinion should be given no probative force and is insufficient to withstand summary judgment" (*Diaz v New York Downtown Hosp.*, 99 NY2d 542, 544).

We agree with defendants that the affidavit of plaintiff's urological expert is insufficient to defeat their motion inasmuch as it is vague, conclusory, speculative, and unsupported by the medical evidence in the record before us (*see DiGeronimo v Fuchs*, 101 AD3d 933, 936-937; *Foster-Sturrup v Long*, 95 AD3d 726, 728-729; *Moran v Muscarella*, 87 AD3d 1299, 1300).  The crux of the opinion of plaintiff's expert, which Supreme Court relied upon in denying defendants' motion, is that defendants deviated from the standard of care in failing to order a CT scan with contrast of decedent's abdomen and pelvis on February 16, 2004 and that, but for such deviation,

defendants or other medical providers would have diagnosed the purported underlying cause of decedent's condition, i.e., an aortic dissection, in sufficient time to surgically correct that condition. However, even assuming, arguendo, that decedent's urological symptoms on February 16, 2004 were caused by an aortic dissection, we agree with defendants that the affidavit of plaintiff's expert fails to raise an issue of fact with respect to proximate cause (*see generally Bey v Neuman*, 100 AD3d 581, 582-583). Notably, plaintiff's expert does not opine that defendants should have diagnosed an aortic dissection allegedly existing on February 16, 2004 based upon decedent's complaints of pain and urinary retention on that date. Rather, plaintiff's expert asserts that, based upon those complaints and the February 15, 2004 CT scan showing an enlarged left kidney, "[a] reasonable differential diagnosis . . . would have included acute infarct of the left kidney." According to plaintiff's expert, in order to rule out that condition, defendants "had a duty to assure that, at a minimum, a CT [s]can of the abdomen and pelvis, with contrast, [was] performed on February 16, 2004." The expert contends that, if that CT scan had been performed on February 16, 2004, "then diagnosis of [decedent]'s aortic dissection . . . would, more probably than not, have been made." Significantly, however, the medical records indicate that it was a CT scan of decedent's head and chest, not a scan of his pelvis and abdomen, that revealed an aortic dissection on March 1, 2004. Thus, the opinion of plaintiff's expert that an abdominal and pelvic CT scan performed on February 16, 2004 would more likely than not have revealed an aortic dissection is speculative. Moreover, it is undisputed that decedent did not in fact have an infarct of his left kidney. Plaintiff is therefore seeking a determination that defendants were negligent in failing to order a diagnostic test to rule out a urological condition that decedent did not have because that test may incidentally have revealed an underlying and unsuspected cardiothoracic condition. We agree with defendants that the causal link between defendants' alleged negligence, i.e., the failure to order a CT scan with contrast of decedent's pelvis and abdomen to rule out a kidney infarct, and decedent's injuries, i.e., his deterioration and death allegedly from an aortic dissection that might have been disclosed on such a CT scan, is simply too attenuated to raise an issue of fact with respect to causation (*see generally Corsino v New York City Tr. Auth.*, 42 AD3d 325, 327). "[H]indsight reasoning," of course, is "insufficient to defeat summary judgment" (*Brown v Bauman*, 61 AD3d 540, 540-541 [internal quotation marks omitted]).

Although the dissenting justice concludes that the result herein is inconsistent with an earlier decision issued by this Court in a separate appeal in this case (*see Wilk v James*, ___ AD3d ___ [June 7, 2013]), we note that this appeal involves different defendants who had different obligations with respect to the decedent as well as additional medical records that were not submitted in the earlier appeal.

We therefore reverse the order, grant the motion, and dismiss the amended complaint and all cross claims against defendants.

All concur except FAHEY, J., who dissents and votes to affirm in the following Memorandum: I respectfully dissent and would affirm for the reasons stated in the decision at Supreme Court. I add only that, in my view, the result reached by the majority is inconsistent with our decision in a separate appeal in this case (*Wilk v James*, ___ AD3d ___ [June 7, 2013]) in its application of the concept of differential diagnosis to other doctors and medical providers who were involved in this matter.

Entered: July 19, 2013                              Frances E. Cafarell
                                                    Clerk of the Court